IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| UNITED STATES OF AMERICA | § | |
| --- | --- | --- |
| | § | |
| V. | § | CR. NO. C-08-447 |
| | § | |
| MARIJA LILLIE BABAROVIC | § | |

**ORDER DENYING UNITED STATES'**
**MOTION FOR RECONSIDERATION**

On November 4, 2008, the Court orally granted the motion to suppress of defendant Marija Lillie Babarovic ("defendant"). The Court found not credible the testimony of the two Corpus Christi police officers who made the initial stop of defendant.

The United States government ("government") has filed a motion for reconsideration. (D.E. 39). For the reasons stated herein, the government's motion for reconsideration (D.E. 39 ) is denied. The reasons for granting defendant's motion to suppress are detailed below.

**I.    Procedural background.**

In a two count indictment filed July 9, 2008, defendant was charged with possession with intent to distribute more than fifty (50) grams of a mixture or substance containing a cocaine base, (also known as crack cocaine) and more than five hundred (500) grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) and (B).  (D.E. 1).  More specifically, defendant was alleged to have possessed approximately two hundred fifty-eight and twelve hundredths (258.12) grams of crack cocaine, and approximately seven hundred ninety-two and eighty-nine hundredths (792.89) grams of cocaine, on March 20, 2008.  Id.

On October 13, 2008, defendant filed a motion to suppress evidence on the grounds that: (1) her vehicle was stopped without a warrant and without probable cause or reasonable suspicion; (2) she was unlawfully detained without articulable facts for reasonable suspicion of criminal

activity; (3) the search of her vehicle pursuant to an impound/inventory was illegal; and (4) the search of defendant's person was tainted by the preceding illegalities. (D.E. 20).

A hearing was held on defendant's motion to suppress on October 31, 2008, and November 4, 2008. (See D.E. 36, 37).[1] On October 31, 2008, the government offered the testimony of the two police officers who stopped defendant on March 20, 2008, Officer William Broyles and Officer Victor Uribe, as well as the dispatch officer, Lydia Curiel. (See D.E. 36). At the conclusion of the October 31, 2008 hearing, the Court inquired about additional computer records to establish a time line of events, and the hearing was continued. Tr-1 at 135-36. On November 4, 2008, the defense offered defendant's testimony, as well as the testimony of the passenger in the car, Lori Ann Parker. (D.E. 37). At the conclusion of the testimony, the Court orally granted defendant's motion to suppress. Tr-2 at 44-45.

On November 13, 2008, the government filed the instant motion for reconsideration. (D.E. 39). On December 11, 2008, the government filed a notice of interlocutory appeal. (D.E. 47).

## II. Factual background.

On March 20, 2008, Corpus Christi police officers William Broyles and Victor Uribe were running license plates on vehicles they suspected might be stolen.[2] Tr 1 at 12. At the time, they were in a marked patrol car and parked in the parking lot of a motel located on the corner of Navigation Blvd. and I-37. Id.

---

[1] Docket Entry 36 is a copy of the transcript from October 31, 2008, and is referred to herein as "Tr-1," followed by a page reference. Docket Entry 37 is the transcript from November 4, 2008, and is referred to herein as "Tr-2," followed by a page reference.

[2] Running license plates involves entering a vehicle's license plate number into the patrol car's computer to determine if the vehicle has been reported stolen.

Sometime prior to 10:00 p.m., defendant and her passenger, Lori Parker, left defendant's home located on Thomas Street in defendant's vehicle. Tr-1 at 14; Tr-2.  Officer Broyles and Officer Uribe could each see Thomas Street from their location in the motel parking lot. Tr-1 at 38.

Neither officer could state at what time or location he first observed defendant's vehicle. Regardless, at 9:55:07 p.m., Officer Broyles ran a check on plaintiff's license plate. Tr-1 at 25. The license plate came back clear. Id.  (See also D.E. 23, copy of CCPD event log for 3/20/08).

While on the I-37 access road and only a few blocks from defendant's home, the officers pulled defendant over for allegedly driving without a rear license plate light ("LP light").  Tr-1 at 25-26. Defendant turned right off the I-37 access road onto Manchester Avenue and stopped. Tr-1 at 45-46. Defendant and Ms. Parker stayed in the car while Officer Broyles approached the driver's side window to speak to defendant. Tr-1 at 127. Officer Uribe stood between the two cars, that is, in front of the patrol car and behind defendant's vehicle.  Officer Broyles asked plaintiff for her driver's license and proof of insurance. Defendant produced both. Officer Broyles went back to the patrol car and at 9:57:24 p.m., he ran defendant's driver's license through the computer in his patrol car. (See D.E. 23, copy of CCPD event log for 3/20/08.) Defendant's driver's license came back clear. Id.

The officers did not release defendant after her driver's license came back clear. Instead, Officer Broyles determined that defendant appeared "nervous" and "extremely shaky," and he asked her to get out of her car so he could question her about her nervousness away from the passenger. Tr-1 at 28. While still in the car, defendant told Officer Broyles that she was nervous because she had a municipal court warrant. Tr-1 at 29; Tr-2 at 36-37. Officer Broyles then gave defendant's driver's license to Officer Uribe and asked him to run a complete check of defendant through the

information dispatcher. Tr-1 at 29. At 10:07 p.m., the dispatcher confirmed that there was an active municipal court warrant for defendant. Tr-2 at 3-4; Tr-1 at 30. (See also D.E. 23, copy of CCPD event log).

Officer Broyles arrested defendant. At 10:16:33 p.m., the officers called for a female officer to come to the scene to search defendant.

During the stop, Officer Broyles searched defendant's car. He discovered two bags of white powder in a shoebox, along with what appeared to be a large crack cocaine "cookie." Tr-1 at 33. Additional amounts of cocaine were found on defendant's person.

**III.   Discussion.**

Defendant moved to suppress all evidence gathered from the March 30, 2008 search of her vehicle and person on the grounds that: (1) the stop itself was in violation of the Fourth Amendment; (2) she was illegally detained without articulable facts for reasonable suspicion; (3) the search of her vehicle was illegal; and (4) the search of her person was tainted by the preceding illegalities. (D.E. 20, 25).

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Const. amend. IV. The purpose of the Fourth Amendment is to "shield the citizen from unwarranted intrusions into his privacy." Jones v. United States, 357 U.S. 493, 499 (1958). Because the warrant procedure is impractical in exigent circumstances, traffic stops are governed by the proscription against "unreasonable searches and seizures." Terry v. Ohio, 392 U.S. 1, 20 (1968). "Traffic stops are deemed seizures for the purposes of the Fourth Amendment." United States v. Lopez-Moreno, 420 F.3d 420, 430 (5th Cir. 2005).

   **A.   The initial stop of defendant's vehicle was unconstitutional.**

4

The courts analyze the legality of traffic stops under the standard articulated in Terry v. Ohio, which sets out a two-tiered "reasonable suspicion" inquiry. Lopez-Moreno, 420 F.3d at 430; United States v. Valadez, 267 F.3d 395, 398 (2001). Under the Terry standard, a court asks whether the officer's action was (1) justified at its inception; and (2) whether the search and seizure was reasonably related in scope to the circumstances that justified the stop in the first place. Lopez-Moreno, 420 F.3d at 430 (citing Terry, 392 U.S. at 19-20). Furthermore, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officers' suspicion in a short period of time." Florida v. Royer, 460 U.S. 491, 500 (1983). Unless there is additional articulable reasonable suspicion, the detention must end once an officer's suspicion is verified or dispelled. Valadez, 267 F.3d at 398. "At that point, continuation of the detention is no longer supported by the facts that justified its initiation." United States v. Shabazz, 993 F.2d 431, 436 (5th Cir. 1993).

**(1)   First Prong of the Terry test.**

To justify the initial stop of defendant, the government argues that Officer Broyles and Officer Uribe observed what they believed to be a non-working LP light, which is a violation of the Texas Transportation Code. Indeed, under Texas law, the rear license plate of a vehicle is required to be illuminated so that it is visible from 50 feet. See Tex. Transp. Code Ann. § 547.322 (Vernon Supp. 2008). Specifically, § 547.322(f) provides:

> A taillamp or a separate lamp shall be constructed and mounted to emit a white light that: (1) illuminates the rear license plate; and (2) makes the plate clearly legible at a distance of 50 feet from the rear.

Tex. Transp. Code Ann. § 547.322(f).

The Court concludes that there was no traffic violation to justify the stop of defendant's vehicle. The evidence shows that Officer Broyles first saw defendant's vehicle when she was at the

corner of Thomas Street and Navigation. Tr-1 at 38. Although he was able to see her front license plate, he did not run it at that time. Id. Officer Broyles saw plaintiff turn off Thomas Street onto the I-37 access road, but he did not follow defendant's vehicle at that time, but instead, traveled in the opposite direction out Navigation.[3] Tr-1 at 12, 41. At some point, however, he decided they were getting too far out, almost out of the city limits, so he turned the patrol car around and headed back toward I-37. Tr at 12, 43. He claims that they just happened to re-encounter defendant on the I-37 access road near exit 3A. Tr-1 at 22-24. He brought the patrol car behind defendant's vehicle, yet again, he did not pull defendant over at that time for her LP light. Tr-1 at 43. Instead, he continued to follow defendant. Tr-1 at 43-44. He observed defendant proceed properly through several yield signs and traffic intersections with no driving errors. Tr-1 at 44-46. Her driving was not erratic or unsafe. Id. The vehicle, a 2006 Chevy Impala, was relatively new, with no defective equipment. Tr-1 at 46.

Officer Broyles testified that, somewhere on the I-37 access road, he determined that plaintiff's LP light was not working, but again, he did not make a stop. Instead, he ran her license plate through the patrol car computer to see if it had been reported stolen. Tr-1 at 48. Her license plate came back clear.

It was only after defendant's license plate came back clear that Officer Broyles then noticed that the LP light was not working:

    COURT:     When did you turn off your lights to check about her license plate?

    BROYLES:   That was around McBride, when she stopped at the stop sign.

    COURT:     Okay, And you had already run her plates by then.

---

[3] Defendant and Ms. Parker both testified that the patrol car began following them immediately after they turned off Thomas Street onto the I-37 access road. Regardless of when the officers first got behind defendant, there is no dispute that the patrol car followed defendant's vehicle through several intersections on the I-37 access road and ran her license plate number before pulling defendant over.

BROYLES:    Yes, ma'am.

In fact, Officer Broyles had to turn the patrol car's headlights off and on to determine if plaintiff's LP light was working. Tr-1 at 49.

Officer Uribe could not testify with certainty that there was a traffic violation. Indeed, his explanation as to how they came to be behind defendant's car and the reason for the stop is contrived:

> ELLISON: Okay. But do you know whether or not your vehicle then pulled directly behind Ms. Babarovic's vehicle as she came to the I-37 access road and went around the entry ramp through the yield sign and onto the access road?
>
> URIBE: No, I don't – – it wasn't directly behind. I remember I was looking at the screen, and we ended up going towards the access road. And there was a car, not, you know, in the distance, not way up ahead, but there was a car in the distance, where it looked like it did not have a rear license plate light.
>
> ELLISON: And that's when you're on Navigation or on the access road?
>
> URIBE: On the access road.
>
> ELLISON: Okay. So if your partner testified that he saw the vehicle in front of him getting onto the access road from Navigation, that might – – isn't inconsistent. You just weren't paying attention at that point. Is that what you're telling us?
>
> URIBE: Yeah, I wasn't – – I mean, I'm still looking at the computer, and he's driving. So he's going to, he's going to drive. I wasn't sure which, where we were going yet.
>
> ELLISON: At some point, did your partner or did you notice, or did – – how did it come to anybody's attention that there might have been a defective license plate light?

7

> URIBE: Well, as we're driving, I'm just like, "Hey, where are you going? He's like, "Well, this car over here looks like it doesn't have a license plate light." So I was like, "Oh, yeah." So then I noticed. So I'm looking up now. So it's like, "Oh, okay." Alright. So, "Well, let's get closer. Can we tell if it does have one or not?"
>
> ELLISON: How close did you get before you could tell?
>
> URIBE: Well, you've got to get pretty – – from a distance, it looks like there is not a license plate light. It's dark. But as you get closer, because there's that, there's like a reflective cover on the license plate, the headlights from a car illuminate that plate. So when you get closer, you can't tell. ***You really can't tell if it's got lights or not.***
>    So the only way you can really be sure is to turn the light off for just a second or two. And if the whole thing goes black, well then it doesn't have a license plate [light]. Because a lot of times, a license plate has two lights. You know, one will go out, one's still working.
>
> ELLISON: Okay, but – – I'm sorry – but my question was how close were you?
>
> URIBE: To the car?
>
> ELLISION: That was my question
>
> URIBE: I'm not sure.

Tr-1 at 124-25 (emphasis added).

In contrast, defendant testified that her license plate light was working earlier that day as she noticed it when she opened the trunk. Tr-2 at 32. Also, the vehicle was recently purchased, the inspection was valid, and defendant had not experienced any problems with the vehicle since owning it. Tr-2 at 29.

8

The district court is in the best position to weigh the credibility of the testimony of a witness. United States v. Garza, 118 F.3d 278, 282-83 (5th Cir. 1997). Here, the defendant and Ms. Parker stated that the police began following them immediately after leaving defendant's home. In fact, they each stated that the patrol car pulled out from the motel parking lot and began following them right after they left defendant's driveway, pulling up behind them when they turned onto Navigation and before they reached the I-37 access road. Tr-2 at 10, 30.

Officer Uribe essentially admits that he was not paying attention when Officer Broyles began following defendant in the patrol car. Officer Broyles' rendition of events is convoluted and unbelievable. He claims that, despite the fact that he was parked at a motel across from plaintiff's home, he did not follow her when she pulled out of her driveway, but instead, traveled the opposite direction on Navigation, until he realized "there was nothing out there." Tr-1 at 20. Officer Broyles has been a Corpus Christi police officer since 2001, Tr-1 at 7, and his explanation that he suddenly realized that there would be nothing but "truckers and refineries," on Navigation, does not ring true. Indeed, the plausible explanation is that the officers, having finished running license plates at the motel, observed defendant's car on Thomas Street and decided to follow her.

The primary law enforcement purposes for making a traffic stop are (1) to verify a violation of the traffic law has occurred, or is occurring; and (2) to issue the appropriate ticket or citation charging the traffic violation, or make an arrest of the driver based upon the violation. Lopez-Moreno, 420 F.3d at 430. In the instant case, neither Officer Broyles nor Officer Uribe's observations concerning the LP light gave him a reasonable suspicion that a Transportation Code violation was committed or about to be committed. Indeed, Officer Uribe admitted that "you can't really tell if it's [a license plate] got lights or not," Tr-1 at 125, and Officer Broyles could not explain convincingly how the patrol car got behind defendant's vehicle. Moreover, when they ran

defendant's license plate, it was clear, and that should have ended the inquiry. The officers failed to articulate specific facts supporting a reasonable suspicion that defendant was violating the Transportation Code. Therefore, the primary law enforcement purpose of investigating the possibility of a non-working LP light fails to satisfy the first prong of the Terry stop analysis.

**(2)     Second prong of the <u>Terry</u> test.**

Even if the traffic stop is justified at its inception, the subsequent search and seizure must be reasonably related in scope to the circumstances that justified the stop in the first place. Terry, 392 U.S. at 19-20. Here because the traffic stop was not justified, there was absolutely no valid reason to detain defendant or to search her car. However, even if the Court is to assume that the officers' truly suspected a traffic violation to justify pulling defendant over, the continued detention of defendant after her driver's license came back clear should have ended the stop right there.

The detention of the individual must be "temporary and last no longer than is necessary to effectuate the purpose of the stop ...." United States v. Brigham, 382 F.3d 500, 507 (5th Cir. 2004) (en banc). If additional reasonable suspicion arises in the course of the stop, and *before the initial purpose of the stop has been fulfilled*, the detention may continue until the officer confirms or dispels the new reasonable suspicion. Brigham, 382 F.3d at 507 (emphasis added).

Reasonableness is measured in objective terms by examining the totality of the circumstances. Ohio v. Robinette, 519 U.S. 33, 39 (1996). Courts have consistently "eschewed bright-line rules, instead emphasizing the fact-specific nature of reasonableness inquiry." Id. The Supreme Court expressly disavowed a litmus-paper test or single sentence rule, in recognition of the "endless variations in the facts and circumstances" implicating the Fourth Amendment. Id.

In the instant case, the question is whether reasonable suspicion existed for the officers to extend the detention, once the purpose of the stop was fulfilled. The government argues that

reasonable suspicion existed to extend the detention because defendant was "extremely shaky" and acted nervous.

The Fifth Circuit has held that a driver exhibiting signs of nervousness is insufficient to prolong a stop for an investigative detention to determine if other criminal activity is occurring. See United States v. Jenson, 462 F.3d 399 (5th Cir. 2006) (if all computer checks come back clean, then generally, reasonable suspicion disappears and there is no legitimate reason for extending traffic stop); United States v. Santiago, 310 F.3d 336, 340 (5th Cir. 2002) (unreasonable for trooper to detain defendant following traffic stop after records check was completed). In Santiago, the Fifth Circuit found a search unreasonable even though the officer testified that he thought the car might contain narcotics, because the fact that the licenses cleared should have dispelled any suspicion of drug trafficking. Santiago, 310 F.3d at 339, 342. In contrast, the Fifth Circuit has found a search reasonable where the officer specifically suspected drug trafficking because the defendant was traveling on a known drug corridor (I-20), had been arrested for trafficking in the past, did not have a driver's license, and was 500 miles away from the road leading to his alleged destination. United States v. Gonzalez, 328 F.3d 755, 758 (5th Cir. 2003).

Here, Officer Broyles did not articulate any connection between the allegedly suspicious behavior and drug possession, beyond the fact that defendant appeared nervous. Defendant's apparent nervousness alone is not enough. Jenson, 462 F.3d at 404. That is, the government fails to show reasonable suspicion to prolong defendant's traffic stop. The continued detention of defendant while Officer Broyles searched her car exceeded the purpose of the traffic stop, and the evidence obtained from that search is inadmissable.

Under the Terry analysis, the Court concludes that the officers' had no objectively reasonable suspicion of a traffic violation to stop defendant in the first instance, rendering the stop

11

unconstitutional. Further, even had the officers stopped defendant based on a valid traffic violation, they had no reasonable suspicion to extend the search once her driver's license came back clear. The search of defendant's car and person violated the Fourth Amendment.

### B. Vehicle search.

Defendant also maintains that the search of the vehicle itself was unconstitutional because, at the time of the search, she was not under arrest, nor did she give permission to the police officers to search her car. Indeed, the Court reached this same conclusion in orally granting defendant's motion to suppress. (See Tr-2 at 44-46).

An inventory search is permissible under the United States and Texas constitutions if it is conducted pursuant to a lawful impoundment. South Dakota v. Opperman, 428 U.S. 364, 372-75 (1976); Benavides v. State, 600 S.W810 (Tex. Crim. App. 1980). Indeed, a valid inventory of an impounded vehicle is one of the few exceptions to the requirement that police may conduct searches only pursuant to a valid warrant. Opperman, 428 U.S. at 367-78; Colorado v. Bertine, 479 U.S. 367, 371 (1987).

The government bears the burden of proving that an impoundment is lawful and may satisfy its burden by showing that (1) the driver was arrested, (2) no alternatives other than impoundment were available to ensure the automobile's protection, (3) the impounding agency had an inventory policy, and (4) that policy was followed. Garza v. State, 137 S.W.3d 878, 882 (Tex. App. – Houston [1st Dist.] 2004, pet. ref'd). The Court also considers the following factors to determine the reasonableness of impoundment: (1) whether someone was available at the scene of the arrest to whom the police could have given possession of the vehicle; (2) whether the vehicle was impeding the flow of traffic or was a danger to public safety; (3) whether the vehicle was locked; (4) whether the detention of the arrestee would likely be of such duration as to require police to take protective

measures; (5) whether there was some reasonable connection between the arrest and the vehicle; and (6) whether the vehicle was used in the commission of another crime. Josey v. State, 981 S.W.2d 831, 843 (Tex. App. Houston [14th Dist.] 1998, pet. ref'd).

In this case, there was no justification for the search of defendant's car because defendant was not under arrest prior to the impoundment. Defendant and her passenger both testified that, after the officers pulled them over, they were asked to exit the car and sit on the curb, while Officer Broyles began searching the vehicle. Tr-2 at 17, 31. Defendant's passenger, Ms. Parker, was adamant that no arrest occurred prior to the search:

| | | |
|---|---|---|
| MR. ELLISON: | | Would that be he [Officer Broyles] started searching the vehicle? |
| PARKER: | | Yes. |
| THE COURT: | | He didn't handcuff her or arrest her or anything? |
| PARKER: | | No. |
| THE COURT: | | He just started searching the vehicle? |
| PARKER: | | Yes, Ma'am. |
| THE COURT: | | Are you absolutely positive? |
| PARKER: | | Absolutely positive. |
| THE COURT: | you | Were you close enough to your friend to hear whether or not the officer said "I'm putting under arrest"? |
| PARKER: | | Well, after he had already searched the vehicle, he asked her to stand up, and he placed her under arrest. |
| THE COURT: | | And that's when he did it? |

| | | |
|---|---|---|
| PARKER: | | No, he searched it before he put her under arrest. |
| THE COURT: | | Okay. But I'm saying that you're positive you would have heard – – |
| PARKER: | | Yes. |
| THE COURT: | | – – if he said, "you're under arrest," before the search? |
| PARKER: | | Yes, I'm positive. |
| THE COURT: | | Okay. Because you were right next to each other? |
| PARKER: | | We were side by side. |

Tr-2 at 17-18.

Similarly, defendant adamantly denies that she was under arrest at the time the vehicle was searched:

| | | |
|---|---|---|
| ELLISON: | | What happened when the officer asked you to get out of the vehicle? |
| DEFENDANT: | | He asked me a few questions, where I was coming from, where I was going. And then he asked me to sit on the curb. |
| ELLISON: | | Did he tell his partner to arrest you or handcuff you for driving with an open traffic warrant? |
| DEFENDANT: | | No, sir. |
| ELLISON: | | What did the officer do next? |
| DEFENDANT: | | He started searching the vehicle. |
| ELLISON: | | Did he get Ms. Parker out of the vehicle first? |
| DEFENDANT: | | Yes, sir. |

       ELLISON:          What did they do with Ms. Parker?

       DEFENDANT:      They sat her on the curb next to me.

TR-2 at 30-31.

    While both defendant and Ms. Parker clearly remember the sequence of events, the officers had difficulty remembering the details of the evening, and their two accounts are not similar to each other. Officer Uribe stated the following regarding defendant's arrest:

       ELLISON:   When was the driver arrested?

       URIBE:     After I got on the radio with the information channel and they advised me that there was a warrant for her arrest.

       ELLISION:  And is that when you cuffed her?

       URIBE:     No, I didn't cuff her right away. I still had – – I had a guy in the back seat of my car. I went ahead and got on the radio and I asked, "Can you check her for warrants?" They came back with the municipal court warrant. Okay. You know what, yes, she's going to go to jail. But I didn't have anywhere to put her yet, so I didn't immediately put her in handcuffs.

       ELLISON:   Is that when you had her passenger sitting on the curb?

       URIBE:     No, she was still by herself when I was with her.

       ELLISON:   You just said that the, after you had placed her under arrest but you didn't cuff her, the passenger was taken out of the vehicle as well.

       URIBE:     Not right away. She [the passenger] was still sitting in the car, but yes, when she was arrested for the warrant, then the passenger was asked to get out of the vehicle and stay off onto the side. Yes that's correct. She was taken out of the vehicle.

15

> ELLISON: That's what I'm asking you. And that's when you had these two ladies sitting on the curb. You were watching them while Officer Broyles searched the car? Correct?
>
> Uribe: No. She – – no, I had the driver by herself. The passenger was off by – – not with my driver. Not with the arrestee. They weren't together.

Tr-1 at 132-33.

Officer Uribe could not could testify with certainty that defendant had been placed under arrest prior to the search of the car. Moreover, the patrol car computer records reveal that Officer Broyles called in plaintiff's license at 9:57 p.m. and it was clear. Tr-2 at 3. The request for outstanding warrants was received by dispatch at 10:07 p.m. Neither Officer Broyles nor Officer Uribe offer any explanation of what transpired from 9:57 p.m., when they received notice of defendant's clear license, and 10:07 p.m., when they called dispatch information to determine if there were any municipal warrants pending against defendant. Indeed, both defendant and Ms. Parker testified that defendant told Officer Broyles about her municipal court warrant ***before*** he even ran her license because he asked her if there was anything he should know about her before entering her license into the system, and she admitted the municipal court ticket. Tr-2 at 36-37.

Moreover, even if the outstanding warrant gave Officer Broyles the authority to detain and arrest plaintiff, it did not authorize him to search the car. At the point of defendant's arrest for an outstanding municipal warrant, there was no reason for the search of her vehicle. Indeed, Officer Broyles admitted that, had defendant and Ms. Parker been spouses and one was arrested on a municipal warrant, the other spouse would simply drive the vehicle home. Tr-1 at 67. Officer Broyles testified that he did not ask Ms. Parker to drive the car to defendant's home, which was only a few blocks away, because Ms. Parker and defendant "had just recently met." Tr-1 at 68.

However, Ms. Parker testified that she had known defendant for almost three years. Tr-2 at 26. Officer Broyles offers no explanation as to how he had any information concerning the length of defendant's and Ms. Parker's acquaintance, yet he specifically testified that they had "just met a couple of weeks ago." Tr-1 at 68. Obviously Ms. Parker is the more credible witness as to her length of relationship with defendant.

In its motion to reconsider, the government fails to offer any facts to refute defendant and Ms. Parker's account of the events. The overwhelming, credible evidence supports the conclusion that Officer Broyles searched the car before he had confirmation of the outstanding warrant. (Tr-2 at 44).

Thus, for the reasons stated in open court on November 4, 2008, and reiterated herein, the Court finds that the March 20, 2008 search of defendant's car was done in violation of the Fourth Amendment, and the evidence obtained from that search is suppressed.

### C.     Illegal detention.

Defendant argues that her detention following the stop was illegal because the officers lacked the reasonable suspicion that she had committed, or was about to commit, a crime.

As previously discussed, during a traffic stop, an officer is permitted to run a computer check on the driver's license and registration or rental car papers. Terry, 392 U.S. at 19-20 (1968); United States v. Dortch, 199 F.3d 193, 198 (5th Cir. 1999). To justify a more prolonged detention, however, an officer must have articuable facts upon which reasonable suspicion that some crime other than the traffic violation has occurred. Dortch, 199 F.3d at 198-200. In evaluating the legality of an investigatory stop,  the courts examine "whether the officer's action was justified at its

17

inception, and whether it was reasonably related in scope to the circumstances which justified the inference in the first place." Shabazz, 993 F.2d at 435.

Here, once Officer Broyles ran defendant's driver's license and it was cleared, defendant should have been released. See Dortch, 199 F.3d at 200. The only specific articuable fact alleged by Officer Broyles to continue to detain defendant was that she appeared extremely shaky and nervous. But even if this observation was correct, the government does not present adequate evidence of a nexus between defendant's alleged suspicious behavior and any specific criminal activity. Jenson, 462 F.3d at 405. Moreover, Officer Broyles did not relate to his partner any of his suspicions. Further, he made no observation as to Ms. Parker's conduct.

### D. Search of the person.

Following the finding of the cocaine in the vehicle, the officers called a female officer to search defendant's person, and, thereafter, they found an additional quantity of cocaine on her. For the reasons discussed above, had the officers not illegally initiated or extended the traffic stop, the drugs would not have been found. Under the fruit of the poisonous tree doctrine, "all evidence derived from the ... illegal search ... must be suppressed, unless the government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the constitutional violation." Dortch, 199 F.3d at 200-01.

In its motion for reconsideration, the government fails to allege, let alone prove, that there was a break in the chain of events leading to the search of defendant's person. Nothing in the original traffic stop would have caused the officers to suspect drug activity. Here, the search of defendant's person, as fruit of the poisonous tree, must be suppressed. United States v. Jenson, 462 F.3d 399, 408 (5th Cir. 2006).

**IV.     Conclusion**.

The Court finds that the government's alleged grounds in support of the initial traffic stop were not reasonably related to a belief that a traffic violation had occurred, rendering the stop unconstitutional. Moreover, even if the officers' believed that a traffic violation had occurred, there were no factors to create a reasonable suspicion to extend defendant's detention past checking her driver's license, registration, and proof of insurance. The stop was in violation of defendant's Fourth Amendment rights.

Thus, for these reasons and those stated on the record on November 4, 2008, the evidence seized on March 20, 2008 during the traffic stop of defendant is inadmissible. Defendant's motion to suppress (D.E. 20) is granted. The government's motion to reconsider (D.E. 39) is in all things DENIED.

ORDERED this 22nd day of December, 2008.

_____
Janis Graham Jack
United States District Judge